PALMER v. LOVE.—80 S. W. (2d) 100.

Middle Section.   November 16, 1934.

Petition for Certiorari denied by Supreme Court, March 9, 1935.

J. B. Daniel, of Nashville, for appellant Love.
Bass, Berry & Sims, of Nashville, for appellee executrix.

CROWNOVER, J. Complainant, Mrs. Anne Gray Palmer, executrix of the estate of Joe B. Palmer, deceased, filed her original bill in this cause, seeking to recover from the defendant Love $1,-258.16 account owing by said Love to Joe B. Palmer & Co., brokers.

Defendant Love answered and denied that he owed complainant or Joe B. Palmer & Co. anything, and alleged that if the books of said company showed any amount due by him, the amount so claimed grew out of a gambling transaction, representing losses resulting from speculating on the rise and fall of the market prices of grain, which transactions were in violation of the law; therefore complainant could not enforce the collection of same.

The chancellor held that the transactions were legal and valid; that Joe B. Palmer & Co. actually placed orders with the Chicago Board of Trade for the purchase and sale of grain for Love, in accordance with the rules and regulations of said board, which purchases and sales were offset on said board and Love charged with the differences, and he rendered a decree against Love for $1,719.26, which was the amount of the account with interest.

Defendant Love excepted to said decree and appealed to this court and has assigned errors, which raise only one proposition: Did Joe B. Palmer & Co. actually purchase grain on the Board of Trade for Love's account with the intention of making delivery, or was it understood between Love and Palmer & Co. that there would be no delivery but settlement would be made by paying the difference between the contract price and the market price at a certain time; that is, were they betting on the market?

Joe B. Palmer, of Nashville, from 1920 to 1925, conducted the business of grain and cotton broker, under the first name of Joe B. Palmer & Co. The company was a member of the Chicago Board of Trade.

Their office was equipped with blackboard, telegraph instruments, chairs, etc.

William I. Love was a farmer and real estate man. He was not engaged in handling or using grain, and was a man of small means.

From July 28, 1920, to May 29, 1925, Love almost daily went to the offices of Palmer & Co. and placed orders to buy or sell grain. Palmer & Co. required him to deposit with them at intervals a small sum as margin for their protection. Usually on the same date of a purchase of grain or an order to sell grain for Love, the grain purchased was sold at the then market price, and Love's account debited with the loss, if any, or credited with the gain. The account between Palmer & Co. and Love shows that every transaction was settled on "differences." In some instances he is debited or credited on his account with "privileges."

Love testified that he had no intention to actually buy or sell grain; that he had no use for grain; that he was merely buying "futures,"

gambling on the rise and fall of market prices of grain; that no grain was ever delivered to him; and that each transaction between him and Palmer & Co. was settled by his either being credited or debited with the difference between his bid and the market price. He stated that he would make his order, "Buy five thousand bushels of wheat," or, "Sell five thousand bushels of corn;" but he said this was the way to place a bet that the market would go up or down; and that Palmer & Co. conducted what is called a "bucket shop."

Joe B. Palmer died before this suit was instituted and the suit was brought by his executrix.

R. V. Cook, who was manager of the company, testified that at the time of all of the transactions in question Joe B. Palmer & Co. was engaged exclusively in the business of receiving and executing orders to buy or sell for immediate or future delivery grains and other commodities, acting solely and exclusively in all of said transactions as an agent, broker, or commission merchant, and that in every instance where defendant Love dealt with the company, it acted as such agent or broker, executing his orders on the Chicago Board of Trade, which was a legitimate Board of Trade where bona fide trading in these commodities was actually carried on, the said Joe B. Palmer & Co. being a member of said Board of Trade; that frequently defendant Love would offset his own purchases with sales; that in other instances Love's purchases or sales would be offset or settled on the Board of Trade.

Cook filed a blank known as "Confirmation Notice," which had blanks for the quantity, delivered, property, price, and names of the parties with whom transactions were had for grain either bought or sold, which notice contained the following statements:

"On all transactions for future delivery we reserve the right to close same without giving further notice when in our opinion security is not sufficient. Orders considered good for one day only unless otherwise specified.

"All orders for the Purchase or Sale of any article received and executed with the distinct understanding that *actual delivery* is contemplated, and that the party giving the orders so understands and agrees.

"All purchases and sales made by us for you are made in accordance with, and subject to the rules, regulations and customs of the Board of Trade of the City of Chicago, and the rules and regulations and requirements of its Board of Directors, and amendments that may be made thereto."

He testified that he gave positive instructions to his stenographer to fill out the form and to mail it to each customer, which he believed had been done; and Love admitted that as a rule the company did confirm each purchase or sale to him with one of these confirmation slips.

Cook further testified that the rules and regulations of the Chicago Board of Trade expressly forbade the conducting of a "bucket shop;" that the rules of the Board of Trade required that actual delivery be made of all commodities bought and sold, unless prior thereto such orders were set off or settled between the members of such Board of Trade.

He stated that Palmer & Co. had no interest in these transactions except the commissions they charged.

Cook says that in four instances deliveries of wheat were made to a warehouse in Chicago for Love, which was later sold by Palmer & Co. for Love's account, but he admits he doesn't know this of his own knowledge. Love says he was never informed of these deliveries and was never charged storage, etc. Love's account shows four entries of "carrying charges," which Cook says were for storage, insurance, etc.

The nature of transactions on exchanges are admirably set out by Mr. Williston in his able work on Contracts, in which he differentiates between gambling contracts and valid purchases and sales on the exchanges, as follows:

"There is no question anywhere that the dealings of a 'bucket shop,' where market prices are used as a basis for the settlement of differences on so-called purchases and sales and where no delivery is ever made or expected, are gambling; but the bulk of the speculative transactions in the United States is carried on through the machinery of stock and produce Exchanges, by the rules of which an actual delivery of the stock or produce (or of its symbols) is required as between the members of the Exchanges who contract with one another as principals. These contracts made on the Exchanges are, therefore, not within the definition of gambling transactions, and the use of a clearing house where contracts to buy and to sell made by the same broker on the same day may be set off against one another without actual deliveries in so far as the contracts cancel one another, is not objectionable. As between the broker and his customer the situation is different. The party called a broker is in reality much more than that. He does not bring his customer in contract with a principal, but contracts on the Exchange himself as a principal. He advances in speculative transactions ordinarily the greater part of the capital needed to finance them on the Exchange. He knows frequently that the customer's resources are insufficient to enable the latter to pay in full either immediately or within any probable time in the future the full cost of the stock or produce purchased on his account, or to furnish the full amount of anything sold 'short' for his account. The ordinary method of carrying on the business will, therefore, involve the making of new transactions on the Exchange of the converse kind to those first made, and a settlement of differences between broker and customer.

No agreement to this effect is ordinarily made and none is needed, for the Exchanges being in constant operation, the customer always has it in his power to order the settlement of his account by new transactions on the Exchange, and if the customer's margin becomes insufficient, the broker similarly has power to close the account by making the necessary transactions on the Exchange, and applying whatever credit or securities of the customer he may have towards the balance. This being the ordinary situation, two questions arise:

"(1) May the contract between broker and customer be invalid, though the contracts or sales entered into on the Exchange for the customer's account are valid?

. "(2) Assuming that the first question is answered in the affirmative, is the contract between broker and customer invalid under such circumstances as are stated above?" 3 Williston on Contracts, 2944-2946, sec. 1671.

He goes on to say that "the agreement between the customer and broker may be held invalid though the transactions contemplated on the Exchange were valid;" that the validity of the contract depends on the intent of the parties to make actual delivery of the grain, at the time the contract was entered into, although the parties may subsequently change their minds; and, where "one of the parties contracts in good faith, intending that the goods shall be actually delivered, he is entitled to the benefit of his contract, no matter what may have been the secret purpose or intention of the other party; while the party guilty of an intent to gamble cannot recover." 3 Williston on Contracts, 2941 to 2949, secs. 1669 to 1674.

Dealing in futures and speculations on exchanges are governed by both the Federal Grain Futures Act of Congress (7 U. S. C. A., sec. 1 et seq.) and the Tennessee Act of 1919, ch. 94.

The Federal Grain Futures Act, September 21, 1922, ch. 369, 42 Stat. 998, U. S. C. tit. 7, sec. 6 (b), 7 U. S. C. A., sec. 6 (b), requires that the contracts be made by or through a member of a designated board of trade, and be evidenced by a record in writing, showing dates, parties, and their addresses, the property, its price, and terms of delivery.

"The Grain Futures Act did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal. The Grain Futures Act recites in section 3 (7 U. S. C. A., sec. 5) that transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; that they 'are susceptible to speculation, manipulation, and control;' and that the resulting obstruction to and burden upon interstate commerce in grain and the products and by-products thereof 'render regulation imperative for the protection of such commerce.' Section 4 (7 U. S. C. A., sec. 6 (b)) declares that 'it shall be unlawful' to

engage in such transactions except, among other things: '(b) Where such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a "contract market," . . . and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery.'

"The federal act declares that contracts for the future delivery of grain shall be unlawful unless the prescribed conditions are complied with. It does not provide that if these conditions have been complied with the contracts, or the transactions out of which they arose, shall be valid. It does not purport to validate any dealings. Nor is there any basis for the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded. The purpose of the Grain Futures Act was to control the evils of manipulation of prices in grain. Such manipulation, Congress found, was effected through dealings in grain futures. See Board of Trade v. Olsen, 262 U. S., 1, 32, 43 S. Ct., 470, 67 L. Ed.. 839, 848. Many persons had advocated, as a remedy, that all future. trading be abolished. Congress took a less extreme position. It set up a system of regulation and prohibited all future trading which did not comply with the regulations prescribed. But it evinced no intention to authorize all future trading if its regulations were complied with. Both the language of the act and its purpose are clear; and they indicate the contrary. The Missouri law is in no way inconsistent with the. provision of the federal act. It does not purport to legalize transactions which the federal act has made illegal. It does not prescribe regulations for exchanges. Obviously, manipulation of prices will not be made easier, or the prevention of such manipulation be made more difficult, because the state has declared that certain dealings in futures are illegal, and has forbidden the maintenance within its borders of places where they are carried on. Since there is nothing in the state law which is inconsistent with, or could conceivably interfere with the operation or enforcement of, the federal law, the statute of Missouri was not superseded. Compare Savage v. Jones, 225 U. S., 501, 533, 32 S. Ct., 715, 56 L. Ed., 1182, 1194." Dickson v. Uhlmann Grain Co., 288 U. S., 188, 53 S. Ct., 362, 365, 77 L. Ed., 691, 83 A. L. R., 492.

The Tennessee statute providing that the purchase and sale of commodities for future delivery is legal, is very broad and provides that it shall be liberally construed. This statute, chapter 94 of the Acts of 1919, provides that contracts and transactions, "wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts," shall be closed or adjusted on the market quotations .or prices made on the Board of Trade without

586

being bona fide transactions on such Board of Trade are declared illegal and unlawful. "Provided, however, that nothing herein shall be construed to forbid or to declare unlawful the business of receiving and executing orders to buy or sell for immediate or future delivery any of the property or commodities set out in the preamble of this Act, where the individual, firm or corporation receiving such order shall act solely and exclusively as an agent, broker, or commission merchant, for the individual, firm, or corporation giving such order, and where the agent, broker or commission merchant receiving such order shall either in person or through another agent execute the same upon, and in accordance with the rules and regulations of any legitimate produce, stock or cotton exchange or Board of Trade or other similar body, located either within or without this State, where bona fide trading in these commodities or property is actually carried on, where the rules or regulations thereof forbid the practice or mode of trading hereinbefore declared to be unlawful, and where said rules or regulations require both the buyer to accept and the seller to make delivery upon all transactions entered into upon said exchange, or Board of Trade, and all such transactions are hereby declared to be lawful and enforceable, and provided further, that no such contract for the purchase or sale as aforesaid, executed as aforesaid upon any legitimate Exchange or Board of Trade, shall be deemed unlawful as lacking the essential elements of an actual delivery thereon, for the reason that said contract has been subsequently offset or settled between the members of such Exchange or Board of Trade with or through whom any such contract or contracts were made or executed, where the only effect of said offset or settlement has been to substitute other parties, either as buyers or sellers, for those with or through whom the transaction was originally made."

This statute was held to be valid in the case of Shepard & Gluck v. Thomas, 147 Tenn., 338, 246 S. W., 836.

■ Both of said statutes must be complied with. It was not intended that one of the acts should supersede the other. If the contract violated the state law, where the contract was made, then the contract was illegal, irrespective of where the goods were to be delivered or whether the exchange was outside the boundary of the state. Dickson v. Uhlmann Grain Co., supra.

"The vice which renders contracts or purchase or sale of cotton, grain, or other personal property to be delivered in the future, which are valid on their faces, wagering contracts and illegal, is the intention of both parties, when they are made, that they shall be settled and the obligations under them discharged by the payment of the differences between the contract and the market prices of the property at the respective times fixed in the contracts for their delivery. There are lawful methods to-wit: By set-off and ring-

ing off, and the payment of the differences, of closing out such contracts and discharging the liabilities of the parties thereunder before the times for deliveries of the property fixed therein arrive, so that no liability to deliver or receive or pay will exist at the fixed times for delivery. Where such contracts are closed out before such times of delivery, the legal presumption is, in the absence of substantial evidence to the contrary, that at the time the parties made the contracts they intended to close them out by these legal methods, and not by the illegal method of paying the difference between the contract prices and the market prices at the times of delivery, so that there would be no liability to deliver and no delivery of the property at such times for deliveries, and this intention is a lawful intention which does not detract from the good faith of the parties or the validity of the contracts." Gettys v. Newburger, (C. C. A., 8), 272 Fed., 209, 219; Lyons Milling Co. v. Goffe & Carkener (C. C. A., 10), 46 Fed. (2d), 241, 83 A. L. R., 501; 3 Williston on Contracts, 2943, sec. 1670; Coles v. Morrow, 128 Tenn., 550, 162 S. W., 577; Id., 130 Tenn., 700, 162 S. W., 577; Shepard & Gluck v. Thomas, supra.

"The intention that governs the validity of the transaction is that which exists at the time of entering into the contract. A subsequent actual settlement by an adjustment and payment of differences does not affect the validity of the original contract. Subsequent settlement of differences is at most only evidence of the prior intent. Contracts for future delivery made with the intention of settling them by set-off or by ringing off or ringing out and by the payment of differences, in accordance with the rules and practice of boards of trade, are valid and enforceable agreements. They are to be distinguished from contracts made with the understanding that they will be settled by paying the difference between the contract price and the market price at a certain time." 27 C. J., 1064, sec. 275.

A contract for the sale of grain to be delivered at a future date is valid, even though the seller has not the grain and can only get it by going into the market and buying it before the date of delivery, provided that, at the time of making the contract, the parties really intend the grain shall be delivered by the seller and that the purchase price shall be paid by the buyer. Lyons Milling Co. v. Goffe & Carkener, supra; Irwin v. Williar, 110 U. S., 499, 508, 4 S. Ct., 160, 28 L. Ed., 225.

"The defendants urge, and some of the cases which they cite take the view, that the pecuniary inability of the defendants to pay the full price charged for the stocks bought ought to have great weight in inclining the court to believe that the intention was not to buy, but to fix a starting point for a wager. We do not find any force in this argument, particularly when the purchase is made through a broker, and the purchaser avails himself of the broker's credit

and facilities for borrowing on the stocks themselves. It only indicates at the most that the customer is buying for speculation, rather than for permanent investment. Says Mr. Dewey (Contracts for Future Delivery [and Commercial Wagers], 129): ''The argument so strongly urged in these cases, that the party dealing in such enormous amounts is not able to pay for them, is without force, and has no tendency to show the contracts were not bona fide. . . . These cases seem to have proceeded upon the theory that, because a man could not buy or pay for the articles he dealt in, he did not intend his contracts to be bona fide. When we consider, however. that a party buying stocks, for instance, can immediately, without any trouble and at a small interest, borrow money up to within 10 per cent, or even less, of the whole value of the stocks, . . . it plainly appears that the force of this argument is broken. To say a man cannot buy what he is not able to pay for is to destroy the whole credit system, and in effect it would prevent the greater part of legitimate speculation and paralyze business.' '' Winward v. Lincoln, 23 R. I., 476, 51 Atl., 106, 111, 64 L. R. A., 160, 175.

'' 'The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and, if under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager and is null and void.' . . .

''As a sale for future delivery is not on its face void, but is a perfectly legal and valid contract, it must be shown by him who attacks it that it was not intended to deliver the article sold, and that nothing but the difference between the contract and the market price was to be paid by the parties to the contract. And the fact that at the time of making a contract for future delivery the party binding himself to sell has not the goods in his possession and has no means of obtaining them for delivery, otherwise than by purchasing them after the contract is made, does not invalidate the contract. . . .

''In order to invalidate a contract as a wagering one, both parties must intend that instead of the delivery of the article there shall be a mere payment of the difference between the contract and the market price. Pearce v. Rice, 142 U. S., 28, 35 L. Ed., 925, 12 S. Ct., 130; Pickering v. Cease, 79 Ill., 328. In the latter case it was stated:

" 'Agreements for the future delivery of grain, or any other commodity, are not prohibited by the common law, nor by any statute of this state, nor by any policy adopted for the protection of the public. What the law does prohibit, and what is deemed detrimental to the general welfare, is speculating in differences in market values.' " Clews v. Jamieson, 182 U. S., 461, 489, 21 S. Ct., 845, 856, 45 L. Ed., 1183, 1196.

The burden of proving that a transaction is a wager rests upon the party alleging it. Lyons Milling Company v. Goffe & Carkener (C. C. A.), 46 Fed. (2d), 241, 247, 83 A. L. R., 501; Clews v. Jamieson, supra; Cleage v. Laidley (C. C. A., 8), 149 Fed., 346, 352; Browne v. Thorn (C. C. A., 8), 272 Fed., 950, 952; Hoyt v. Wickham (C. C. A.), 25 Fed. (2d), 777, 780.

Purchase of commodities or stocks on margin is not necessarily a gambling transaction. Peters v. Grim, 149 Pa., 163, 24 Atl., 192, 34 Am. Rep., 599; Winward v. Lincoln, supra; 3 Williston on Contracts, 2941, sec. 1169; Clews v. Jamieson, supra; 27 C. J., 1062, sec. 274. "Margin" is security, nothing more. Winward v. Lincoln, supra.

A contract giving one party or the other an option to carry out the transaction or not, at pleasure, is not a wager. It is legal unless forbidden by statute. 3 Williston on Contracts, 2942, sec. 1669; Clews v. Jamieson, supra.

A "set-off" is a method by which a contract to purchase is set off against a contract to sell without the formality of an exchange of warehouse receipts or other actual delivery and, in legal effect, is a delivery. Lyons Milling Company v. Goffe & Carkener, supra.

"We must suppose that from the beginning, as now, if a member had a contract with another member to buy a certain amount of wheat at a certain time, and another to sell the same amount at the same time, would be deemed unnecessary to exchange warehouse receipts. We must suppose that then as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith, for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. Set-off has all the effects of delivery." Board of Trade of Chicago v. Christie Grain & S. Co., 198 U. S., 236, 248, 25 S. Ct., 637, 638, 49 L. Ed., 1031, 1038; Lyons Milling Co. v. Goffe & Carkener, supra.

"Ringing up, ringing off or ringing out is a method by which a group of dealers on a board of trade discharge contracts for future delivery before delivery is due by a system of off-sets, cancellations and adjustment of differences in lieu of actual delivery of the commodity sold. Williar v. Irwin, 30 Fed. Cas., 38, No. 17,761; Ward v. Vosburgh (C. C.), 31 Fed., 12, 16; 27 C. J., p. 994, sec. 120.

It is simply a more complex case of set-off. Board of Trade of Chicago v. Christie Grain & S. Co., supra, 198 U. S. [236], 248, 25 S. Ct., 637, 49 L. Ed., 1031.'' Lyons Milling Company v. Goffe & Carkener, supra.

''Option contracts which take the form or nature of 'puts' or 'calls' are not per se illegal, unless there is no intent to settle the differences. If the latter intent exists, such contracts fall within the statutes prohibiting options. And it has been said that such transactions are merely methods adopted for speculating in the differences of the market value of commodities. A contract in the nature of a 'straddle' or 'spread eagle,' which partakes of the nature of both a 'put' and 'call,' whereby one party buys the privilege of either selling to or buying from the other at a stipulated price and within a limited time, is not per se a gaming contract, unless intended as a mere cover for a bet or wager on the future price of the stock or commodity. A contract for a contract of purchase and sale of a commodity is not within, but is at least once removed from any transaction which might come within, a statute making unlawful all purchases and sales or pretended purchases and sales, or contracts and agreements for the purchase and sale, of commodities without any intention of receiving and paying for the property so bought, or of delivering the property so sold.'' 27 C. J., 1062, sec. 273.

''Hedging is lawful. It is recognized as a legitimate and useful method of insuring against loss on a contract for future delivery. A purchase or sale made as a hedge is none the less 'a serious business contract for a legitimate and useful purpose that it may be off-set before the time of delivery in case delivery should not be needed or desired.' Board of Trade of Chicago v. Christie, supra, 198 U. S. [236], 249, 25 S. Ct., 637, 639, 49 L. Ed., 1031.'' Lyons Milling Company v. Goffe & Carkener, supra.

The cases on the subject of purchases of commodities for future delivery hold that such transactions are legal if the intention of the parties at the time of entering into the contract is that delivery of the grain or other commodity shall be made, unless settled by set-off on the Board of Trade.

The Tennessee statute, chapter 94 of the Acts of 1919, provides that such contracts are not gambling contracts unless both parties or the broker intended to gamble.

''The facts, known to the adversary party to the contract, that a party to a future contract is not financially able to pay for the commodities which he has contracted to buy, or that he has no means with which to buy the commodities which he does not own and which he has contracted to sell, or that he is not a regular dealer in the commodity and has no means for facilities for taking,

handling, or storing it, are evidence tending to show that the intention of the parties is to gamble." 27 C. J., 1065, sec. 280.

However, the testimony shows that the brokerage firm did not intend to gamble; that it gave confirmation notice for each transaction and intended delivery; therefore defendant Love has failed to show that this was a gambling transaction.

The burden of showing that these were gambling contracts was on Love (see citations supra), which he has failed to show.

The early Tennessee decisions, made before the Act of 1919, are not in point.

It results that the assignments of errors must be overruled and the decree of the chancellor affirmed. A decree will be entered in this court in complainant's favor for $1,719.26 with interest from November 10, 1933. The cost of the cause including the cost of the appeal is decreed against appellant Love.

Faw, P. J., and DeWitt, J., concur.

## On Petition for Rehearing.

CROWNOVER, J. This case is again before us on a petition for a rehearing and for an additional finding of facts. We are of the opinion that the petition must be denied, as there is abundant evidence that Love had the transactions with Joe B. Palmer & Co. and owed the debt. The manager filed copies of the itemized accounts and testified that Love owed the amounts, and Love stated, "I will have to accept their word for it."

We are also of the opinion that this court has found in its original opinion all the facts requested in the petition for a rehearing that are material and necessary to a determination of this case. We held that grain was not actually delivered to Love in Nashville, but the contracts contemplated actual delivery of the grain at the time the transactions were had, as required by the rules of the Board of Exchange unless off-set prior to time for delivery. The debt sued on was based on credits and adjustments on differences, privileges, etc., as set out in the itemized account filed as exhibit A to R. V. Cook's deposition.

We are of the opinion that the other facts that we are requested to find, such as that Love refused to work for Palmer because of the gambling character of the business, that Palmer made no effort to collect the account during his lifetime, and that Love was insolvent and a bad risk, are immaterial and are sufficiently covered in our original opinion. We do not think that Palmer was a particeps criminis in the gambling transactions of Love; hence the petition for a rehearing must be denied.

Faw, P. J., and DeWitt, J., concur.