CLOUD COTTON COMPANY, Respondent, v. T. J. WHITE, Petitioner.—366 S. W. (2d) 144.

Western Section at Jackson. August 31, 1961.

Certiorari Denied by Supreme Court November 9, 1962.

W. W. Lackey, Savannah, for petitioner.

Ross & Ross, Savannah, for respondent.

CARNEY, J. The defendant, T. J. White, has filed the record for writ of error in lieu of an appeal from a decree of $2,325.66 rendered against him in the Chancery Court of Hardin County. Defendant White operates a cotton gin at Saltillo, Tennessee, and the complainants, J. W. Cloud and W. L. Gladdish, Jr., doing business as Cloud Cotton Company, were engaged as cotton brokers and cotton merchants with their offices in Huntsville, Alabama. In December, 1954, they held membership in the New Orleans Cotton Exchange. At the time of the trial below the partnership was inactive and involved in certain legal proceedings leading to dissolution.

On December 20, 1954, the defendant, T. J. White, had on hand 161 bales of cotton which he had ginned for and purchased from his customers. This cotton was in compresses or warehouses located in Jackson, Tennessee, and Henderson, Tennessee.

The complainant, Cloud Cotton Company, purchased the 161 bales of cotton based on actual samples of each bale of cotton. The warehouse receipts were turned over to Cloud Cotton Company and the cotton was then promptly sold and delivered by Cloud Cotton Company to several different mills in Alabama and Georgia. This is known as a sale of spot cotton as distinguished from a sale of cotton futures.

The cotton was not sold at a determined price but under a provisional agreement known in the cotton trade as "seller's call, 109 points off July, 1955—New Orleans futures." There is no dispute as to the agreement which was confirmed in writing by the purchasers as follows:

" Members:                              Phone 641-LD 9910
Atlantic Cotton Association
American Cotton Shippers Association

"CLOUD COTTON COMPANY
HUNTSVILLE, ALABAMA
December 20, 1954

"CONFIRMATION NO. P 1494

"To   Mr. T. J. White
       Saltillo, Tennessee

"Dear Sir(s):
   "We confirm (Purchase) this date of

| | |
|---|---|
| "No. of B/C | 161 |
| Description | Actual samples |
| Price | 109 points off July New Orleans, Sellers call |
| Shipment or Delivery | Prompt |

| Reimbursement | Draw with warehouse receipts attached thru First National Bank, Huntsville |
|---|---|
| Remarks | Two cents per pound margin to be left on deposit with us. |
| | Either party has right to call the other on a 100 point fluctuation of the market in their favor. |
| | To fix price call LD 9910 Huntsville |

"Yours very truly,
/s/ J. W. Cloud

"ACCEPTED:_____
PLEASE SIGN AND RETURN COPY"

The defendant, T. J. White, drew a draft on the Cloud Cotton Company for $26,260.51 which represented an advance on the purchase price of the cotton less storage and warehouse expenses and two cents a pound margin which was held by Cloud Cotton Company as security against a decline in the price of cotton. This two cents a pound margin amounted to $1,651.98 which was slightly more than $10.00 per bale. The amount of the advance, the storage plus margin equaled the value of the cotton on July, 1955, futures less the basis of 109 points as of the day of the sale, December 20, 1954.

Under the terms of the agreement whenever the price of July, 1955, cotton on the New Orleans Exchange advanced as much as 100 points the Cloud Cotton Company was obligated to send to T. J. White approximately $800.00 or $5.00 per bale thus keeping the margin at two cents per pound or $10.00 per bale. Likewise, whenever the price of July, 1955, cotton on the New Orleans Exchange decreased as much as 100 points T. J. White was obligated to remit to Cloud Cotton Company the sum of $800.00 or approximately $5.00 per bale to keep up his margin of two cents a pound or $10.00 per bale. T. J.

White, the seller of the cotton, had the exclusive option to terminate the contract at any date he wished.

White let the contract ride without calling the price on through January and February, 1955, and in March, 1955, the price of July, 1955, futures on the New Orleans Cotton Exchange declined more than 100 points and at the request of the complainant, Cloud Cotton Company, the defendant, T. J. White, sent $800.00 to maintain his margin of two cents a pound.

Under the rules of the cotton exchange all contracts for July, 1955, cotton futures matured in June, 1955, and the price of Mr. White's cotton would have automatically been set by the termination of the July futures market except the parties by agreement extended the call contract over to October, 1955, futures and the basis was changed from 109 points off July to 103 off New Orleans October, 1955, futures market.

In September, 1955, the October futures contracts matured and by agreement of the parties the contract was transferred to the May, 1956, cotton futures on the New Orleans Exchange at a basis of 135 points off the May quotation. On September 29, 1955, Cloud Cotton Company requested the defendant, T. J. White, by telegram to send an additional $800.00 to maintain his two cents a pound margin because the price of cotton had dropped more than an additional 100 points. The defendant, T. J. White, ignored this telegram.

On October 3, 1955, the market had further declined to the extent that the defendant's margin had been completely wiped out and he was indebted to the complainants in the amount of $1,700. Complainants were impatient, called the defendant by phone and he promised to

remit promptly a check in the amount of approximately $1,600. The check was not sent.

On October 7, 1955, the complainants, not having heard anything further from the defendant, T. J. White, drew a draft on the defendant in the amount of $2,500 representing $1,700 indebtedness due from defendant to the complainant on his contract and an additional $800.00 for margin. The draft was presented at defendant's bank on October 10, 1955, the defendant refused to honor the draft and so notified the complainants by telephone.

Immediately both partners, J. W. Cloud and W. L. Gladdish, drove from Huntsville, Alabama, to Saltillo, Tennessee, where they conferred at length with Mr. White trying to collect this $2,500. Mr. White failed to give them any satisfaction.

The complainants testified that he refused to put up any more money and told them to go ahead and do what they thought was best in the matter. The defendant, T. J. White, testified that he asked them to wait until the next day until he could confer with his lawyers in Savannah, Tennessee, that he had some question in his mind about the solvency of Cloud Cotton Company.

On the following day, October 11, 1955, Cloud Cotton Company closed out the account with Mr. White by letter as follows:

October 11, 1955

"REGISTERED MAIL
"Mr. T. J. White
Saltillo, Tennessee

"Dear T. J.
"This is to confirm fixing price on 161 bales of our purchase #1494 from you as per our conversation when I was at your gin last night.

May New Orleans closed yesterday 30.31. This makes final price 28.96 cents per pound. This leaves a debit balance of $1775.54 in your account with us.

"Yours truly,
CLOUD COTTON COMPANY
by

"cc: Ross & Ross
Attorneys at Law
Savannah, Tennessee"

On October 17, 1955, the complainants filed their bill in the present cause seeking a judgment against the defendant, T. J. White, for the sum of $1,785.54, it being averred that the letter of October 11, 1955, addressed to Mr. White erroneously showed the balance as $1,775.54 when it should have been $1,785.54.

Upon the trial the Chancellor found in favor of the complainants and rendered judgment. He allowed complainants recovery of interest from October 11, 1955.

The principal defense offered by Mr. White in the court below and in this court is that the contract was void as a wagering contract under T.C.A. Section 39-2023 and other laws against wagering contracts. We quote Section 39-2023 for convenience as follows:

"39-2023. 'Bucket shop' defined.—A bucket shop within the meaning of secs. 39-2023—39-2029 is defined to be an office, store, or other place wherein the proprietor or keeper thereof, or other person or agent either in his or its behalf, or as an agent or correspondent of any other person, within or without the state, conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any stocks, grains, provisions, or

other commodity or personal property wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or price made on any board of trade or exchange upon which the commodities or securities referred to in such contracts, agreements, trades, or transactions are dealt in and without a bona fide transaction on such board of trade or exchange, and the maintenance of any such office, store, or other place of business, and the making of such contracts or agreements shall be and the same are declared illegal and unlawful. [Acts 1909, ch. 277, sec. 1; Shan., sec. 6836a1; Acts 1919, ch. 94; Code 1932, sec. 11305.]''

A general definition of a stock or commodity exchange as distinguished from a bucket shop is to be found in 50 Am.Jur., Stocks and Commodities Exchanges, page 622, Section 2:

''Sec. 2. DEFINITION, NATURE, PURPOSE, AND FUNCTIONS; KINDS OF EXCHANGES.— An exchange is a voluntary association or corporation organized for the purpose of furnishing to its members a convenient and suitable place to transact their business, of promoting uniformity in the customs and usages of merchants, of inculcating principles of justice and equity in trade, of facilitating the speedy adjustment of business disputes, of acquiring and disseminating valuable commercial and economic information, and generally of securing to its members the benefits of co-operation in the furtherance of their legitimate pursuits. The best-known ex-

changes are stock, produce, livestock, cotton, and grain exchanges. Most of the stocks, bonds, and other public securities, and cotton, grain, and other produce of the world are bought and sold in the great exchanges of this and other countries, and the market values of such commodities are established in them. It is said that the exchanges stand in the gateway of commerce and that their growth and progress in commercial influence have been commensurate with the ever-increasing business of the country. The word 'exchange' also means the exchange hall where the members meet every business day to buy and sell for themselves, or as brokers for their customers, for present and future delivery. An exchange, however, is not a public market.

\* \* \* \* \* \*

"Bucket Shops distinguished.—The term 'bucket shop' is used to describe an establishment conducted nominally for the transaction of a stock exchange business, or a business of similar character, but really for the registration of bets or wagers, usually for small amounts, on the rise or fall of the prices of stocks and commodities. The bucket shop uses the terms and outward forms of the exchanges, but differs from exchanges in that there is no delivery of, and no expectation or intention to deliver or receive, the securities or commodities nominally dealt in."

In the case of Palmer v. Love, 18 Tenn. App. 579, 80 S. W. (2d) 100, this court held that the burden of proof rested upon the party alleging the contract to be a wagering contract. Thus in the case at bar the burden of proof is on the defendant, T. J. White to prove the contract illegal as being in violation of T.C.A. Section

39-2023 or other anti-gambling laws of the state. In our opinion Mr. White has failed to carry this burden of proof.

█ Neither of the parties were gamblers: Mr. White was in the business of ginning and buying cotton from the farmer. Cloud Cotton Company was in the business of buying cotton from ginners and other merchants and selling cotton to the mills. Cloud Cotton Company also was engaged in the business of trading on the New Orleans Cotton Exchange. All of these are legal transactions and constitute a very important segment of our nation's economy.

The defendant, T. J. White, as the owner of 161 bales of cotton in December, 1954, felt that the market on cotton would improve. He could have sold this cotton for all cash to Cloud Cotton Company in December, 1954.

Since Mr. White thought the price of cotton would improve, naturally he wanted to get the benefit of that increase in price on his 161 bales. He could have kept the cotton in the warehouses and waited several months before he sold the cotton. If he had followed this course, interest on the money invested and storage charges would have been heavy.

Instead, he followed a practice which is recognized throughout the cotton industry as a legitimate practice and sold the cotton to Cloud Cotton Company at a designated basis on the futures market at seller's call. By means of this transaction the defendant White was able to draw nearly all of the sale price of the cotton, was able to stop the running of nearly all of the interest and was able to stop the running of storage and insurance expenses on the cotton. Thus he was able to speculate

on the expected rise in the price of cotton with only a very small amount invested and with the power exclusively within his control to terminate the contract and take his profit or loss any day he saw fit.

On the other hand the cotton merchant, Cloud Cotton Company, had markets for these 161 bales of cotton and it took immediate delivery of them. It sold the cotton to various mills and collected for it.

While neither of the partners testified in so many words that Cloud Cotton Company fixed its cost price on the cotton bought from White by entering a hedge on the New Orleans futures market, we think the inference is inescapable that such was done and that Cloud Cotton Company bought approximately 161 bales of cotton on the New Orleans July, 1955, futures market at purchaser's call on the same basis as the spot cotton was bought from White. There is no testimony in the record, by cross-examination or otherwise, that a hedge was not entered.

The partners testified that they made a reasonable profit on the cotton they bought from White and sold to the mills. If they had not hedged on the futures market then they would not have had a profit on this cotton until after Mr. White called his sale of cotton and set the price and until the partners had collected the amount due from Mr. White on his contract which of course they have not done even as yet.

The other evidence which indicates very clearly that a hedge was entered by Cloud Cotton Company is the letter written on September 26, 1955, from Cloud Cotton Company to Mr. White shown on page 8 of the transcript and which we copy as follows:

"CLOUD COTTON COMPANY
  Box 431
Huntsville, Alabama                    Sept. 26, 1955
"Mr. T. J. White
Saltillo, Tennessee

"Dear T. J.
  "Was able to transfer 161 bales call cotton from October to May New Orleans at 25 points. This makes new basis 135 off May.

  "Spot cotton is getting much cheaper here. Looks as if some has got to go on Loan.

                              "Regards
                              /s/ J. Cloud"

After the hedge was entered it made no difference to Cloud Cotton Company so far as its profit on the cotton bought from White was concerned whether the market went up or down. Cloud Cotton Company's purchase on the New Orleans Cotton Market would be called immediately following the call by Mr. White.

Thus if the price of cotton had gone up after the purchase from T. J. White, the Cloud Cotton Company would owe Mr. White for the increase in price. Correspondingly Cloud Cotton Company would have a profit of approximately the same amount on the 161 bales of cotton it bought on call on the New Orleans Futures Market. On the other hand since the price of cotton went down, Cloud Cotton Company lost approximately the same amount on its purchase on New Orleans Futures as it gained on its contract with Mr. White.

Thus the futures market enabled Mr. White to speculate on the price of his 161 bales of cotton and enabled

Cloud Cotton Company to avoid speculation on its cost price of the same 161 bales of cotton.

■ There is nothing even suggestive of a bucket shop operation in the above transaction. In our opinion T.C.A. Section 39-2023 was not intended to cover and does not cover sales of spot cotton such as the one in controversy. However, even if we assume that it does cover such sales, the record affirmatively shows that Cloud Cotton Company did make a "bonafide transaction" on the New Orleans Cotton Exchange as provided in T.C.A. Section 39-2023.

We hold that the contract between White and Cloud Cotton Company is valid under T.C.A. Section 39-2023 and the other anti-gambling laws of Tennessee. Assignments of error I and II are therefore respectfully overruled.

■ Assignment of error No. III insists that the Chancellor should have held for the defendant because complainant Cloud Cotton Company was not damaged by the defendant's failure to place additional margin or "call the cotton." This assignment is predicated upon the statement by the partners that they made a reasonable profit on the sale of the cotton bought from White. It is also predicated upon the assumption that Cloud Cotton Company did not place a hedge on the New Orleans Futures Market by buying 161 bales of cotton on call to offset its purchase of 161 bales of cotton on call from White. Since we find the record does show such hedge by Cloud Cotton Company assignment of error No. III is overruled.

■ Assignments of error IV and V insist that when the price of cotton declined to the extent that it wiped out

the defendant's margin and the defendant' White refused to put up any additional margin, the complainant, Cloud Cotton Company, was obligated to call the cotton immediately thus leaving the defendant's balance with the complainant, Cloud Cotton Company, at zero.

The rules and regulations of the New Orleans Cotton Exchange are not proven in the record. The custom obtaining in the cotton trade relating to sales of cotton on call are only meagerly referred to in the evidence.

However, the record affirmatively shows that when defendant White was called for margin the first time he responded by sending the $800.00 additional margin indicating that he did not want to be sold out without an opportunity to put up additional margin upon further decline in the market. After this last $800.00 margin was wiped out, defendant White promised by telephone to send more margin. Under these circumstances we think Cloud Cotton Company was justified in not calling the cotton but giving Mr. White every opportunity to keep the contract in force is he so desired. If Mr. White wanted the cotton called if the market declined enough to wipe out his margin, he could have and should have indicated his wishes to Cloud Cotton Company.

Even on the late afternoon or evenings of October 10, 1955, after the draft had been turned down and when the parties drove to Mr. White's gin at Saltillo, Tennessee, asking for the margin and asking Mr. White to bring his contract up to date, the defendant, White, still tried to put them off and evade calling the cotton by asking them to wait until the next day so he could talk to his lawyers. It was only after this final plea and only after Mr. White still refused to put up any additional money

that Cloud Cotton Company terminated the contract on the following day.

Mr. White's testimony that he did not want to sell the cotton on call is not very convincing. He has been connected with the gin business and cotton business for over thirty years. From a reading of his deposition it is our opinion that he was familiar with the practice of selling cotton on call; was fully aware of the risk involved and was not overreached by Cloud Cotton Company in any manner. In the final analysis it appears to us that Mr. White thought cotton was going to go up and instead it went down. This has been the experience of many people through the years, oftentimes with disastrous results. Assignments of error IV and V are not well taken and must be respectfully overruled.

Assignment of error No. VI insists since the defendant, White, had the exclusive right under the contract to call the cotton and since the record shows that the defendant, White, never actually called the cotton, he does not owe the complainant, Cloud Cotton Company, anything under the contract. We find no merit whatsoever in this insistence.

The defendant, White, had the exclusive right to call the cotton but he also had a corresponding duty under the contract to keep the proper margin. Implicit in the contract is the right of the purchaser, Cloud Cotton Company, to call the cotton and terminate the contract when the seller refuses to put up the margin after repeated express requests by the seller for such margin. Defendant White had every opportunity to put up more margin or to terminate the contract himself and he expressly refused to do either. Under the circumstances

the purchaser, Cloud Cotton Company, had no alternative but to terminate the contract itself. Hence, assignment of error No. VI is respectfully overruled.

We have read the case of Washington Mills Co. v. Frohlick, (1927), 5 Tenn. App. 217, cited by defendant White. It involves a purchase of cotton by a mill from the defendant cotton merchants, the price to be fixed upon call by the purchaser instead of the seller. The facts of the Frohlick case are so different from the case at bar that we do not find the decision in the Frohlick case controlling of the case at bar though the lengthy discussion of the purchase and sales of cotton on futures market is interesting.

It follows that all of the assignments of error are respectfully overruled. The decree of the Chancellor is affirmed at the cost of defendant T. J. White.

Avery, (P. J. W. S.), and Bejach, J., concur.