IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

## NASHVILLE, DECEMBER TERM, 1913

---

COLES *v.* E. C. & H. E. MORROW.*

F. H. & C. R. MORGAN *v.* SAME.

### (*Nashville.* December Term, 1913.)

1. **EXCHANGES.** Dealings. Parties.

Where a broker, who was a member of a board of trade operating under rules authorizing members to act as brokers between other members only, except in the making of contracts between members and authorized agents of carriers, or insurance or banking companies in connection with their legitimate business, negotiated contracts of sale or purchase with another member, who disclosed the buyer or seller, and the contracts

---

*Reporter's Note*: This case was decided at the December Term, 1913, of the supreme court at Nashville. It is reported in 1 Thompson (128 Tenn.), at pages 550 to 564, both inclusive. However, owing to important errors affecting the substance of the holding, it is thought advisable to re-print it here.

Coles v. Morrow.

were confirmed, the contracts were the broker's own contracts, and not for the benefit of his customers not members, though the broker issued to each customer an instrument in the form of a confirmation of the contract of sale or purchase on his account.   (*Post, pp.* 708-710.)

2. **GAMING.   Gambling transaction.   Purchase on margin.**

Where a customer dealt with a broker, who was a member of a board of trade, by purchasing grain on margin, without any purpose of receiving grain, and on the understanding that if the price declined so as to consume the margin, the customer should put up an additional margin or the broker could close out the transaction and charge the customer with the difference between the price at which the supposed purchase was made and the subsequent sale at market price, the transaction was a gambling transaction, and the money received by the broker in the conduct of his business was recoverable by the customer. (*Post, pp.* 711-713.)

3. **GAMING.   Recovery of money lost.   Parties entitled to recover.   Statutes.   Construction.**

Shannon's Code, sec. 3162, authorizing actions to recover for the benefit of the wife or children of the loser of money in a gambling transaction, does not limit the right to recover for the benefit of minor children of a loser in a gaming transaction, but a recovery may be had for the benefit of adult children. (*Post, pp.* 714, 715.)

Code cited and construed:   Sec. 3162 (S.).

Acts cited and construed:   Acts, ch. 251; Acts 1909, ch. 277.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County to the Court of Civil Appeals, and by *certiorari*

from the Court of Civil Appeals to the Supreme Court.
—JOHN ALLISON, Chancellor.

JAMES L. WATTS, for plaintiff.

CHARLES C. TRABUE, for defendants.

MR. CHIEF JUSTICE NEIL delivered the opinion of the
Court.

Both of these cases were brought originally in the
chancery court of Davidson county, and judgments
were rendered in each against the defendants there-
to; but the amount involved in the first case having
fallen below the sum required to justify an appeal to
this court, the appeal was prosecuted to the court of
civil appeals, and the judgment was there affirmed.
The case was then brought here by the writ of *cer-
tiorari*. The second case was appealed directly to this
court from the chancery court. Both cases were tried
in the chancery court on the same evidence, so far as
concerned the vital points on which the controversy
depends, and they were tried in the same manner here.
The evidence was taken originally in the *Coles Case,*
but was also used in the *Morgan Case.*

Each case was brought to recover money alleged to
have been paid the defendants in the prosecution of
gambling transactions. There is no controversy about
the sums expended, except as to one item in the *Mor-
gan case.* Upon this point we shall further on state
our conclusions; and also upon still another point in

that case which we shall not now more specifically mention. The only real controversy is whether the transactions complained of were gambling transactions.

As the evidence was taken in the *Coles Case* we shall state the substance of it from the standpoint of that case.

At the time the money was paid to them defendants held themselves out as brokers and bankers doing business at No. 205 Third Ave., North, in the City of Nashville. Their place of business consisted of a room twenty-five by sixty feet. At one end was a blackboard, and in front of this board were twelve chairs for their customers. The defendants were the heads of the business, but they had in their employ one Frank W. Dillion, who was general manager, and also operator of a private wire into the business place of the Board of Trade of the city of Chicago. Defendants were members of this organization. As transactions were had on the floor of that Exchange, sales of wheat, corn, or other products dealt in there, the prices at which the sales were made, were reproduced on the blackboard within a few seconds after the transactions occurred in Chicago. The prices on such actual transactions were placed on the blackboard for the information of defendants' customers, to guide them in their fictitious deals in the various commodities named on the board, that is, as materials on which to base their judgment as to the probable course of the market, in order that they might act in the light of such course of the market, mirrored in its momentary fluctuations

Coles v. Morrow.

in the Exchange. If any one desired to make a deal, the custom was to notify Mr. Dillion, and he wrote the instruction down in briefest memorandum, and telegraphed the substance of it in the name of C. E. & H. E. Morrow to Logan & Bryant, in Chicago, who were also members of the Board of Trade. The order might be to buy or sell so many thousand, say five thousand, bushels of wheat, or corn, for May delivery, at a stated price, say ninety-eight and three-fourths cents per bushel. Logan & Bryan, on receiving the order, would make the purchase or sale, on the floor of the Exchange, and notify defendants by wire that this had been done, and the next day a letter would follow giving the name of the person to whom the sale had been made, or from whom the purchase had been made, if the order was for a purchase. These were called confirmations. And the slips of paper on which they were written and printed contained the notice or stipulation that all deals were made pursuant to the rules of the Board of Trade. One of these rules was in substance that no deals should be made which did not contemplate an actual delivery, and that there should be no trading merely for the purpose of, and with the expectation of, settling by differences between the contract price and the market price. Another rule was expressed as follows:

"XIV. A. Members may act as brokers between other members only, except in making contracts between members of this association and authorized agents of transportation companies, vessel owners,

railroad, insurance or banking companies in connection with the ordinary legitimate business of the latter, but in all cases the agent or broker of such person, firm or corporation, shall be held liable both for the acceptance of contracts by alleged principals and for the faithful execution of the same, under the rules of the association, by such principal. Provided that on C. I. F. contracts for grain for shipment to points outside Chicago, the broker so contracting may, if desired, give up to members for whose account such contracts have been made, the name of his principal, even though such principal be not a member of this association. Provided, however, that in such cases brokers shall be held liable both for the acceptance of such contracts and for their faithful performance under the rules of this association.

"B. Brokers shall be held personally liable on any transaction made by them until they have given the name of a principal acceptable to the other party to the transaction.

"C. A commission or brokerage must be paid on every transaction as prescribed in this rule."

Pursuing this rule, the orders to Logan & Bryan referred to went forward in the name of defendants, as already stated, as their orders, and for their benefit, and the confirmations came back to them in the same way, showing in each instance that the sale, or purchase, had been made to or by the person named in the confirmation as seller or buyer, as the case might be. The confirmations usually contained several trans-

actions embracing deals started by different custom-
ers of defendants. The following example will illus-
trate a series of transactions wherein purchases were
confirmed, viz.:

"Logan & Bryan,
Commission Merchants,
No. 2 Board of Trade.
Chicago, 12/21—1911.

E. C. & H. E. Morrow,

.    .    .    .    .    .    .

We have this day *bought* for your Account:

All purchases and sales made by us for you are made
in accordance with and subject to the rules, regulations
and customs of the Board of Trade of the city of Chi-
cago and the rules, regulations and requirements of
its Board of Directors, and all amendments that may
be made thereto.

| Quantity | Delivery | Article | Price | Of Whom Bought |
|---|---|---|---|---|
| 10 | May | W | 98¾ | King, Farnum & Co. |
|    |      |   |     | McCarthy |
| 10 | ,, | ,, | 98⅝ | Finley, Barrell & Co. |
|    |      |   |     | King, Farnum & Co. |
| 10 | ,, | ,, | 98⅜ | Copenhagen |
| 5 | ,, | ,, | 98¼ | King, Farnum & Co. |
|    |      |   |     | Fay |
| 10 | July | ,, | 93¾ | Squire |

The following show some transactions wherein sales
were confirmed:

"Logan & Bryan
Commission Merchants
No. 2 Board of Trade.
Chicago, 12/27—1911.

E. C. & H. E. Morrow

. . . . . .

We have this day *sold* for your account:

All purchases and sales made by us for you are made in accordance with and subject to the rules, regulations and customs of the Board of Trade of the city of Chicago and the rules, regulations and requirements of its Board of Directors, and all amendments that may be made thereto.

| Quantity | Delivery | Article | Price | To Whom Sold |
|---|---|---|---|---|
| 10 | May | W | 98⅝ | Wing |
| | | | | Bartlett |
| 10 | ,, | ,, | 99 | Scott" |

But it is to be observed that these transactions were all negotiated by Logan & Bryan, as brokers for E. C. & H. E. Morrow, and the contracts when made were between the persons named in the confirmations as sellers or buyers, and the said E. C. & H. E. Morrow. The customers of E. C. & H. E. Morrow were not known on the Board of Trade, and could not be under Rule XIV. Nor were they known to Logan & Bryan. This was admitted in substance in Mr. Dillon's testimony, wherein he said, referring to a deal or deals embracing 10,000 bushels of May wheat at ninety-eight and three-fourths: "Logan & Bryan, they don't know whom we are trading for; it is all done in our name,

the customers, of course. I mean that it is all done, that is, King, Farnum & Co., they take our contract in Chicago, if I have five on one order and five on another, they bunch it, and they give us a confirmation for each trade."

It is apparent therefore that no contracts were negotiated on the Board of Trade for the benefit of E. C. & H. E. Morrow's customers. The contracting parties were E. C. & H. E. Morrow, and the persons named as buyers, or sellers, in the confirmation slips. It was not within the power of E. C. & H. E. Morrow to confer any legal or equitable right in these contracts on any person not a member of the Board of Trade, with certain exceptions mentioned in Rule XIV, which do not apply to this case. An open attempt on their part to effect contracts on the floor of the Board of Trade for the benefit of Coles, or any other person not a member of the board would not have been recognized by the Board of Trade, and could not have been under Rule XIV. An indirect attempt, by taking the contracts in their own names, could not be more successful.

The contracts, therefore, when taken, were not, in law, for the benefit of their customers, but their own contracts, and the testimony of E. C. & H. E. Morrow that their customers through them as agents bought or sold grain on the Chicago Board of Trade for future delivery, or otherwise, must go for naught.

It is true they attempted to put that face on their transactions when dealing with their customers. Al-

Coles v. Morrow.

though all of the deals as stated were made in their own name, so wired to Chicago, and so confirmed back from Chicago, they upon receiving such confirmation sheets issued to each customer a paper in the form of a confirmation, of which the following to Coles is a sample:

"E. C. & H. E. Morrow,
        Brokers

| 205 Third Avenue North | New York Stock Exchange. |
| Members | Chicago Board of Trade. |
| New York Cotton Exchange | New York Cotton Exchange. |
| Chicago Board of Trade | New York Coffee Exchange. |
| | St. Louis Merchants Exchange. |

Nashville, Tenn., Dec. 21, 1911.

I. G. Coles,
        Nash.

We have this day *bought* for your account:

All purchases and sales made by us for you are made in accordance with and subject to the rules, regulations and customs of the Board of Trade of the city of Chicago, and the rules, regulations and requirements of its Board of Directors, and all amendments that may be made thereto.

| Quantity | Delivery | Article | Price | Of Whom Bought |
|---|---|---|---|---|
| 5M | May | Wht | 98¾ | |

The following in case of a sale:

"E. C. & H. E. Morrow,

Brokers

205 Third Avenue, North,

Members

New York Cotton Exchange

Chicago Board of Trade

New York Stock Exchange.

Chicago Board of Trade.

New York Cotton Exchange.

New York Coffee Exchange.

St. Louis Merchants Exchange.

Nashville, Tenn., Dec. 27, 1911.

I. G. Coles

Nash.

We have this day *sold* for your account:

All purchases and sales made by us for you are made in accordance with and subject to the rules, regulations and customs of the Board of Trade of the city of Chicago and the rules, regulations and requirements of its Board of Directors, and all amendments that may be made thereto.

| Quantity | Delivery | Article | Price | To Whom Sold |
|----------|----------|---------|-------|--------------|
| 5M | May | Wheat | 98⅝ | |

They could not, however, as we have just said, by these papers or otherwise, give their customers any interest in the contracts, any rights in contracts limited by their express terms to members of the Board of Trade. If such right could be transferred, and enforced, in violation of Rule XIV, the whole scheme of the organization would be disarranged, and such confusion would be introduced that in no long time its purposes would be wholly frustrated. We might, in order to show this more fully, go into an analysis of

the plan of the organization as disclosed in its rules, made under the authority of its charter, but aside from the great length to which such analysis would extend this opinion, we deem it unnecessary.

The contracts then were at all times the property of E. C. & H. E. Morrow. We shall now state how they dealt with their customers in respect of these contracts.

Take the case of Coles. When he gave the so-called order to Dillion, say for the purchase of 5,000 bushels of wheat, no matter what price, he was required to pay to E. C. & H. E. Morrow three cents on each bushel, say $150.00 as a "margin." This was in the nature of a security against the decline of the wheat below the price at which E. C. & H. E. Morrow were to buy it on the floor of the Exchange. If the price went off so as to consume the margin, Coles was called upon to put up an additional amount. So, in case the deal were in the form of a sale of wheat, and the market advanced to such an extent as to consume the margin, he was called upon to margin the deal again. In case he failed to do so, when the deal was in the form of a purchase of grain, defendants, E. C. & H. E. Morrow, had this specific deal closed out on the Board of Trade, by causing to be sold an equal number of bushels of grain at the then market price, and charged Coles with the difference between the price at which the supposed purchase was made and the subsequent sale at market price. A similar proceeding was had in case the deal were in the form of a sale, and the dif-

ference between sale price and market price at the
time of default ascertained.   In a purchase-contract
when the market advanced over the purchase price, if
the customer, say Coles, wished the deal closed out by
sale this was done, and the profit shown by the differ-
ence between the purchase price and the price realized
at the subsequent sale, was credited to him.   So, in
case the deal were in the form of a sale of grain, and
the market price declined below the contract price,
Coles could ask the defendants to close the deal, and
they would do so, and the difference would be credited
to him as profit.

In this manner, Coles speculated in the rise and fall
of the market, settling always by differences.   He tes-
tifies that he had no thought or purpose, in any case
of either making or accepting delivery of the grain
represented by the contracts.   We may add that he had
no power under the rules of the Board of Trade to do
either, because he was not known there, and as we
have already pointed out, had no interest in the con-
tracts.   We may further state that the rules of the
board contain most elaborate provisions on the subject
of delivery, and all of them contemplate delivery by
one member of the board to another member, on the
floor of the Exchange, in a specified symbolic form, of
warehouse receipts, etc.   Coles was no member, and
he could have neither made nor accepted a delivery,
and as stated, he never contemplated such a thing.   It
is equally certain that C. E. & H. E. Morrow never
themselves contemplated either making or receiving

a delivery of grain on any of these contracts, that is, that they themselves would make any delivery of grain, or receive any. Where a change in the market, up or down, showed a profit on any of the contracts which E. C. & H. E. Morrow had made on the initiative of any of their customers, and such contracts were cashed at such profit, of course no question arose between them and their customers. But the testimony shows that when a loss was imminent, the margin had been consumed, and the customers declined to put up additional margin, in every instance the Morrows closed the deal, and charged the customer with the difference. C. E. & H. E. Morrow never in any such case contemplated or expected delivering or accepting delivery of the property; that is on any such contracts, initiated by their customers. They and Coles were simply using the deals as counters to speculate in the rise and fall of the market, the differences to be ascertained in the manner already mentioned. This was a pure gambling transaction. We have no doubt, it is true, that had any of the customers of E. C. & H. E. Morrow desired to make or accept a delivery on any contract initiated by such customers though in the name of the said Morrows, and legally belonging to them only, the latter would have seen to it that proper facilities were provided to that end, in their own name if the customers furnished the money. But we do not conceive that this fact would in the least divert the application of the legal principles controlling the controversy. It would not add a legal *status* to the course of dealing

previously existing between Coles and the two Morrows. It would not transmute these illegal dealings into the lawful contracts had between C. E. & H. E. Morrow, and other members of the Board of Trade of Chicago.

Defendants say they had no interest in the deals except the commissions they expected to realize out of them, one-half of $7.50 on each 5,000 bushels of grain involved, the other half going to Logan & Bryan. Concede it as true that all they expected to realize on the deals was the commissions, and that this was all they did realize. Still the deals were all their own. They were conducting a gambling business, and they must, under the law repay the money received by them in the conduct of such illegal business; and it is immaterial whether they kept the money themselves, or turned it over to some other.

In this view, it is unnecessary that we discuss the question whether ch. 251, Acts of 1883, is repealed by ch. 277, Acts of 1909.

We are of the opinion that the chancellor charged defendants in the *Morgan Case* with $1,362.49 in excess of the true amount. It is true that when Morgan entered upon the series of transactions which he subsequently conducted with defendants, they gave him credit by an item of $2,194 taken over from Thomas Plater & Co. This, however, represented a deal or deals Plater & Co. had made for Morgan, and out of these deals only $831.51 in cash was received by defendants. The item of $2,194 should therefore be re-

duced to that extent, leaving due in the *Morgan Case,* after deducting a credit of $115, the sum of $3,777.51 with interest.

The action in the *Morgan Case* was brought by his children, under Shannon's Code, section 3162, which reads as follows:

"Any other person may, after the expiration of the ninety days, and within twelve months thereafter, recover the amount of such money, thing, or its value, by action for the use of the wife; or, if no wife, the child or children; and if no child or children, the next of kin of the loser."

It is shown the children were not minors, and it is therefore insisted that the suit could not be brought by them. There is no such restriction in the statute, and we cannot insert it. This objection must therefore be overruled.

It results that the decree of the court of civil appeals in the *Coles Case* must be affirmed; and the decree of the chancellor in the *Morgan Case,* after modification, as above indicated, must also be affirmed, with interest from the date of the chancellor's decree.