**PAINE, WEBBER, JACKSON & CURTIS, INCORPORATED**

v.

**Lee V. LAMBERT**

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.**

v.

**Lee V. LAMBERT.**

**Civ. A. Nos. 3–74–335, 3–74–339.**

United States District Court,
E. D. Tennessee, N. D.

Jan. 27, 1975.

As Amended March 10, 1975.

Ronald C. Koksal, E. Bruce Foster, Frantz, McConnell & Seymour, Knoxville, Tenn., for Paine, Webber.

Robert R. Campbell, Hodges, Doughty & Carson, Knoxville, Tenn., for Merrill Lynch.

Frank Bird, David T. Black, Maryville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Before the Court are plaintiffs' motions for summary judgment in actions 3–74–335 and 3–74–339. As both actions seek to recover from defendant Lee V. Lambert for alleged indebtedness on essentially similar commodity transactions, the Court received oral argument on both motions at the same time.

In both cases the Court's jurisdiction is invoked under 28 U.S.C. § 1332.

In action 3–74–335 plaintiff, Paine, Webber, Jackson & Curtis, Inc. (PWJC), seeks to recover $32,544.00 from defendant plus interest from November 11, 1974. Defendant's answer, and pleadings to this time, freely admits all the

factual allegations contained in PWJC's complaint but denies the indebtedness in any amount on the ground that the underlying transaction was a gaming transaction and therefore illegal and unenforceable in a court of law. In action 3–74–339, plaintiff, Merrill Lynch, Pierce, Fenner & Smith, Inc. (MLPFS), seeks to recover $80,000.00 plus interest from November 11, 1974. Similarly, defendant admits the alleged transaction occurred but asserts the gambling defense. At this point, the Court will set forth the factual background giving rise to the present controversy. The following facts constitute the entire relationship between defendant and PWJC and MLPFS and are basically undisputed.

Desiring to participate in the buying and selling of commodities on the futures market, Lambert on October 3, 1974, entered a Blount County office of PWJC and stated that he wished to arrange for PWJC to extend to him a line of credit and .to buy and sell commodities on his behalf on the Chicago Mercantile Exchange and other major exchanges. In anticipation of opening a commodities account for Lambert on October 3, 1974, four PWJC documents were executed by Lambert.[1] More particularly he signed (1) a "client qualification form commodities", (2) a statement that buy and sell orders would be made against corresponding quantities, (3) a statement authorizing transfer of funds from one account to another in order to maintain proper margins without the necessity of PWJC making a call and, (4) a general commodity and lending agreement, setting forth the conditions controlling the operation and maintenance of a commodity account with PWJC.[2] On the qualification form under Section B entitled "Investment Objective and How Client Proposes to Conduct Commodity Business" spaces are provided for the potential client to

1. See Exhibits accompanying PWJC's complaint.

2. Defendant's answer emphasizes the size of the type in the last document and submits

that it is rendered legible only with the aid of a magnifying glass. As between the parties to this controversy, it does not require a magnifying class to see that this argument carries little weight with the Court.

indicate that his purposes in opening a commodities account are, (1) "Hedge or trade account", (2) "Speculation", or (3) "Other (Specify)". In this case Lambert evidently indicated that his purpose was to hedge as the word "hedge" appears next to the first category. Thereafter, pursuant to the above agreements, Lambert on November 11, 1974, placed an order with a PWJC broker to buy on his behalf 25 contracts of frozen pork bellys for delivery in February 1975 at a total purchase price of $559,494.00; however, due to PWJC's October 3 extension of credit to Lambert and the applicable exchange laws and regulations, he was required only to deposit a $25,000.00 margin. PWJC on the same day placed an order for the purchase of 25 contracts on the Chicago Mercantile Exchange. Two days later, on November 13, 1974, PWJC was informed by Blount National Bank that Lambert had placed a stop payment order with Blount National on the $25,000.00 margin check tendered by Lambert as security to PWJC on November 11. Having been advised of the stop payment order and as the pork bellys market was then declining, PWJC sought to have Lambert honor his check and post additional security to satisfy applicable margin requirements. Unsuccessful in its efforts to locate and advise Lambert, PWJC, under the terms of the commodity agreement, sold the 25 February pork bellys contracts on the Chicago Mercantile Exchange as Lambert's agent at a total loss of $32,544.00, the amount plus interest that PWJC seeks to recover. The PWJC November 13 transactions are evidenced by a confirmation notice (Exhibit 1 to PWJC's motion for summary judgment), which provides in part:

We have made the following transactions for your account and risk.

| Mo. | Day | Year | Bought | Sold | Commodity | Price | Mkt. | Values |
|-----|-----|------|--------|------|-----------|-------|------|--------|
| 11 | 11 | 74 | 8 | | Feb Pork Bellys 75 | 6220 | 2 | $179,136.00 |
| 11 | 13 | 74 | | 8 | Feb Pork Bellys 75 | 5867½ | 2 | $168,984.00 |
| 11 | 11 | 74 | 17 | | Feb Pork Bellys 75 | 6215 | 2 | $380,358.00 |
| 11 | 13 | 74 | | 17 | Feb Pork Bellys 75 | 5867½ | 2 | $359,091.00 |

| Account No. | T | RR | Account Purchase | Loss or Gain | Commission | Net Amount |
|-------------|---|----|------------------|--------------|------------|------------|
| AC 22984 | 7 | 24 | and Sale of Items Described | $31,419.00 | 1125.00 | 32,544.00 (Debit) |

As indicated, pork bellys experienced a rapid decline between the purchase date of November 11, 1974, and November 13, 1974. The reverse side of the above confirmation notice states in applicable part that:

"All purchases, sales and other transactions made or entered into by us for you are subject to the rules, regulations and customs of the board of or exchange on which they are executed and to all federal, state and other laws and regulations applicable thereto."

Pursuant to an arrangement similar to that entered into with PWJC, Lambert established a commodity account with MLPFS on July 22, 1974, and, on the same day he purchased 25 February Pork Belly contracts through PWJC, November 11, 1974, he also purchased 55 February Pork Belly contracts through MLPFS. In that case Lambert presented to MLPFS his personal check in the amount of $55,000.00 as margin. Likewise, on November 13 MLPFS was advised by Blount National that Lambert had ordered payment stopped on the margin check. Under Lambert's orders and pursuant to the commodity account agreement, MLPFS sold the 55 contracts at a total loss of $80,000.00. The MLPFS confirmation slips (see defendant's Brief in Opposition) evidence essentially the same information as the

PWJC confirmation slip and appearing on the reverse side of the MLPFS confirmation is the pertinent language that:

"It is agreed between Merrill Lynch, Pierce, Fenner & Smith, Incorporated and the customer:

1. That all transactions are subject to the constitution, rules, regulations, customs, usages, rulings and interpretations of the Board or Exchange or Market and its clearing house, if any, where the transactions are executed, and to all federal and/or state statutes to the extent that same may be applicable thereto."

As noted above, the defendant in response to plaintiffs' allegations vigorously contends that under 39 Tennessee Code Annotated § 2020 (1955) the alleged contract was illegal and void, being a wagering contract since neither plaintiffs nor defendant intended that the commodity in specie would actually be delivered. Defendant has demanded a jury. In its motion for summary judgment, plaintiffs in both cases contend that a judgment should be summarily granted in its favor urging that as a matter of law the above transactions are not void under 39 Tennessee Code Annotated § 2020. In support of its motion plaintiffs urge three grounds: (1) 39 Tennessee Code Annotated § 2023 et seq. removed bona fide commodity transactions conducted pursuant to the rules and regulations of a legitimate exchange from the intent requirements of 39 Tennessee Code Annotated § 2020, (2) that the federal regulation of commodity exchanges preempted or superseded state regulation under state gambling laws, and (3) assuming, arguendo, that 39 Tennessee Code Annotated § 2020 is controlling, the PWJC documents executed by Lambert and the MLFSP confirmation slips evidence the intention of the parties to accept or make delivery and

that such announced intentions cannot be renounced subsequently under Tennessee's parol evidence rule.

◼ The Court has given careful consideration to the oral and written contentions of all the parties to this controversy, in addition to its own independent examination and concludes that under the facts and circumstances of this case the intention of the parties to make or accept delivery of the commodity at the time the purchase contracts were made, although significant in adjudging the validity of a futures contract at common law and under Chapter 277 of Tennessee's Public Acts of 1909 § 1, is no longer controlling in Tennessee. As the intention of the client and broker under the above circumstances is no longer the proper subject of judicial consideration under Tennessee law and as 39 Tennessee Code Annotated § 2028 holds the principal liable for losses suffered by the broker as his agent, and there appearing that there is no factual dispute for a jury to resolve, it is the considered opinion of the Court that plaintiff is entitled to its requested relief pursuant to its motion for summary judgment. Rule 56, F.R.Civ.P.

In light of the grounds for the Court's opinion, it is not necessary to pass on plaintiffs' third issue, that is, the parol evidence argument.[3]

## FEDERAL PREEMPTION

◼ The Court is not persuaded that the presence of federal regulation[4] of the commodity market preempts Tennessee law to the extent that this state's laws affect the validity of futures contracts executed on legitimate exchanges. While the subject of federal preemption was the object of some debate prior to the Supreme Court's decision in Dickson v. Uhlmann Grain Co., 288 U.S. 188, 53 S.Ct. 362, 77 L.Ed. 691 (1933), that decision rendered by Justice Brandeis appears to have squarely faced and re-

---

3. See generally 83 A.L.R. 522, 561 (1933); Taylor, Trading in Commodities, 43 Yale L. J. 63, 67 n. 14 (1933).

4. Commodity Exchange Act, 7 U.S.C. § 1 et seq. (1964).

solved the dispute.[5] There in a series of transactions factually similar to those presently before the Court, Uhlmann Grain Company sought to recover from Dickson losses incurred in the buying and selling of future grain contracts. Dickson defended on the ground that the underlying transactions between him and Uhlmann were fictitious and void under the Missouri Bucket Shop Law, Rev.Stat. §§ 4316–4323 (1929). Concluding that the transactions fell outside the lawful boundaries of Missouri's Bucket Shop Law, the Supreme Court held the contracts void. Careful to distinguish between the validity of futures contract executed as between members of an exchange and the validity of the contractual relationship existing between broker and client,[6] Justice Brandeis submitted that the viability of the two were separate.

"The Grain Futures Act did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal. * * *

The federal act declares that contracts for the future delivery of grain shall be unlawful unless the prescribed conditions are complied with. It does not provide that if these conditions have been complied with the contracts, or the transactions out of which they arose, shall be valid. It does not purport to validate any dealings. Nor is there any basis for the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded. * * * The Missouri

law is in no way inconsistent with the provision of the federal act. It does not purport to legalize transactions which the federal act has made illegal. It does not prescribe regulations for exchanges. Obviously, manipulation of prices will not be made easier, or the prevention of such manipulation be made more difficult, because the state has declared that certain dealings in futures are illegal, and has forbidden the maintenance within its borders of places where they are carried on. Since there is nothing in the state law which is inconsistent with, or could conceivably interfere with the operation or enforcement of, the federal law, the statute of Missouri was not superseded. 288 U.S. at 198–200, 53 S.Ct. at 365 (citations omitted)

It does not appear that interim judicial or legislative directives since the *Uhlmann* decision would compel this Court to conclude that the Commodity Exchange Act preempts Tennessee's laws on the subject of futures contracts.[7]

Remaining before the Court is the rather narrow issue whether 39 Tennessee Code Annotated § 2023 et seq. (1955) removes futures contracts executed through bona fide transactions on a legitimate commodity exchange pursuant to the rules and regulations of such exchange from the intent requirements of 39 Tennessee Code Annotated § 2020. Because Tennessee's statutory and judicial treatment of futures contracts is not without some confusion, it is appropriate at this stage to trace the develop-

---

5. For a discussion of the pre-*Uhlmann* preemption dispute see Taylor, *supra*, Note 3, at 95 and n. 122.

6. A commodity broker contracts with another broker on the floor of the exchange, and, as between the parties to the commodity contract both brokers are principals. As between the broker and his client, the broker is generally viewed as the agent of the principal-client.

7. The Court has reviewed the case of Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754 (1942) and the

commentary on that case, Bachrach, The Cloverleaf Case and Suspension of State Gambling Statutes as applied to Commodity Transactions, 4 John Marshal L.Q. 457, 465 (1942). Unlike the Commodity Butter Act (now codified at 26 U.S.C. § 4811 (1964)) before the Court in the *Cloverleaf* case, Congress in the regulation of commodity markets has evidenced no intention to preempt state gambling laws. Indeed, one commentator suggests that Congress looked to state laws forbidding bucketing to supplement federal regulations. Taylor, *supra*, Note 3, at 98.

ment of the subject in Tennessee and, more specifically, to relate that development to the contentions of the parties.[8]

## COMMON LAW

Approximately twenty-seven years after the "intent test" was first announced,[9] Tennessee adopted the doctrine in determining the validity of contracts calling for the future delivery of goods.

"A contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go [to] the market and buy them. But such a contract is only valid when the parties really intend that the goods are to be delivered by the seller and the price paid by the buyer. If, under the guise of such a contract, the real intent be merely to speculate in the rise and fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the dates fixed for executing the contracts, then the whole transaction constitutes nothing more than a wager, and is illegal and void." Marshall v. Thruston, 71 Tenn. (3 Lea) 740, 742–43 (1879) (quoting jury charge).

Thus, the Tennessee courts evidenced an early displeasure with futures contracts where the parties did not intend to make or accept delivery, and the lack of such intent precluded the recovery of any money lost by the broker on behalf of his client, even where the transac-

tions were executed on a legitimate exchange.[10] While it is evident that prior to the passage of the Public Act of 1883, Chapter 251,[11] the intent of *both* the client and broker were determinative of the contract's validity, upon the enactment of the Public Law of 1883, Chapter 251,[12] the intention of *either* party not to deliver or receive rendered the contract a gambling transaction.[13] Chapter 251, Section 1 of the Public Acts of 1883 is currently codified at 39 Tennessee Code Annotated § 2020 and provides in full that:

"Any sale, contract, or agreement for the sale of bonds, stocks, grain, cotton, or other produce, property, commodity, article, or thing, for future delivery, where either of the contracting parties, buyer or seller, is dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties has no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and declared gaming."

The Act, viewed in the first instance by the Tennessee courts as seeking to curb pernicious and ruinous speculation,[14] made the broker effectively liable for his principal's intent.

## THE 1909 BUCKET SHOP ACT

In 1909 the Tennessee Legislature passed the state's first "bucket shop" act, which, although not addressing itself specifically to the legality of future contracts executed through bucket shops,

---

8. For a general discussion of future contracts see 20 A.L.R. 1422 (1922) (hedging); 80 A.L.R. 522 (1933) (gambling); 14 S. Williston, Williston on Contracts §§ 1669A–74 (3rd Ed. 1972); Taylor, *supra*, note 3; Moses, Federal Regulation and State Gambling Laws, 1 Vand.L.Rev. 567 (1948).

9. Grizewood v. Blane, 11 C.B. 526 (1852).

10. Beadles, Wood & Co. v. Ownby, 84 Tenn. (16 Lea) 424, 427 (1886).

11. 39 Tenn.Code Ann. § 2020 (1955).

12. 39 Tenn.Code Ann. § 2020 (1955).

13. McGrew v. City Produce Exchange, 85 Tenn. 572, 578, 4 S.W. 38 (1887).

14. 85 Tenn. at 578, 4 S.W. 38. A similar sentiment was later expressed in 1893 in Allen v. Dunham, 92 Tenn. 257, 1266, 21 S.W. 898, 900 (1893), where Justice Wilkies, speaking for the Tennessee Court, observed "that there is no evil more demoralizing and pernicious in its tendencies and consequences than the spirit of reckless speculation which pervades so largely all sections of our country, and all classes of society. It inevitably leads to speculation, embezzlement, and other crimes. . . ."

made illegal the operation of any business that qualified under the Act as such an establishment. The 1909 Act in Section 1 preliminarily defined a bucket shop and the Court views this definition as significant.

"Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That a bucket shop, within the meaning of this Act, is defined to be an office, store, or other place wherein the proprietor or keeper thereof, or other person or agent either in his or its own behalf, or as an agent or correspondent of any other person, corporation, association, or co-partnership within or without the State conducts the business of making or offering to make contracts, agreements, trades, or transactions respecting the purchase or sale or purchase and sale of any stocks, grains, provisions, or other commodity or personal property wherein both parties thereto or said proprietor or keeper contemplated or intended that the . contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange upon which the commodities or securities referred to in such contracts, agreements, trades, or transactions are dealt in and without a bona fide transaction on such board of trade or exchange, or wherein both parties or such keeper or proprietor shall contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be deemed closed or terminated when the market quotations of prices made on such board of trade or exchange for the articles or securities named in such contracts, agreements, trades, or transactions shall reach a certain figure; and also any office, store, or other place where the keeper, person, or agent or proprietor thereof, either in his or its own behalf or as an agent as aforesaid therein makes or offers to make with others contracts, trades, or transac-

tions for the purchase or sale of any such commodity wherein the parties thereto do not contemplate the actual or bona fide receipt or delivery of such property, but do contemplate a settlement thereof based upon differences in the price at which said property is or is claimed to be bought and sold."

Under the 1909 Act, therefore, an establishment that entered into future contracts was a bucket shop if (1) the client and broker, or broker, intended that the transaction would terminate by a margin settlement, that is, the parties settling on the difference between the contract price and subsequent market price, and without making a bona fide transaction on a board of trade, or (2) the client and broker, or broker, intended that the transaction would terminate upon the commodity's market price reaching a predetermined price, or, finally, (3) if both parties, the client and broker, "*do not contemplate the actual or bona fide receipt or delivery of such property,* but do contemplate a settlement thereof based upon differences in the price at which said property is or is claimed to be bought and sold." The Tennessee Legislature in 1909 specifically concluded in the last provision that the intent of the parties to make or accept delivery of the commodity was controlling in determining the legality of the broker's activities, even though the futures contract to buy or sell had been formulated or terminated through the bona fide buying and selling of commodities on a legitimate board of trade. To this extent Chapter 251 of the Public Act of 1883, Section 39–2020 of the present code, *supra*, governing the legality of the contract, and the 1909 Bucket Shop Act, governing the legality of the broker's operation, shared a common denominator, the intent of the parties. An anomaly apparently existed, however, since under the former Act the intent of either the broker or client was determinative while, under the latter Act, both parties had to possess the intent.

The relationship between the 1909 Act and the 1893 Act was first broached in 1913 Coles v. Morrow, 130 Tenn. 700, 162 S.W. 577 (1913), where the Supreme Court held that where neither the client nor the broker manifested any intent to make or accept delivery of the commodity, although legally possible, such contracts were gambling transactions despite the fact that all the contracts in question were the result of bona fide transactions made on a recognized exchange. Since the Court concluded that neither party intended to receive or deliver the commodity and since such an intent was fatal with respect to both the legality of the contract under the 1893 Act, and the broker's business under the 1909 Act, the court submitted that "[i]n this view, it is unnecessary that we discuss the question whether ch. 251 Acts of 1893, is repealed by ch. 277, Acts of 1909." 130 Tenn. at 714, 162 S.W. at 580.

## THE 1919 ACT

Following the *Coles* decision, the 1909 Act was substantially amended in 1919, giving rise to the present 1955 Tennessee Code Sections 39–2023 through 39–2029. Unlike its predecessor, however, the 1919 Act was aimed at both the legality of the broker's establishment and the legality of the transactions conducted by the broker. Moreover, the criteria used to determine if a brokerage house constituted a bucket shop were considerably delimited. Thus, Section 1 was amended in 1919 Act to read in part as follows:

"That a bucket shop within the meaning of this Act is defined to be an office, store, or other place wherein the proprietor or keeper thereof, or other person or agent either in his or its behalf, or as an agent or correspondent of any other person, corporation, association, or co-partnership within or without the State, conducts the business of making or offering to make contracts, agreements, trades or trans-actions respecting the purchase or sale or purchase and sale of any stocks, grains, provisions or other commodity or personal property wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or price made on any Board of Trade or Exchange upon which the commodities or securities referred to in such contracts, agreements, trades or transactions are dealt in and without a bona fide transaction on such Board of Trade or Exchange, and the maintenance of any such office, store or other place of business, and the making of such contracts or agreements shall be and the same are declared illegal and unlawful."

Identical to Section 39–2023 of the present 1955 Code, it is readily apparent that two criteria which formerly rendered transactions in futures bucket shop transactions were deleted by the legislature in 1919, mainly, (1) the intention to close out at a predetermined price and (2) *the intention of both parties not to receive or deliver the commodity*. A comparison of the two Acts (the 1909 and 1919 Acts) cannot ignore the marked absence of the "intent to make or receive delivery test" in the 1919 Act and the presence of the same test in the original 1909 Bucket Shop Act. In this posture, a clear and unmistakable legislative command requires that the Court look only to the single twofold criterion that was originally announced by the legislature in the 1909 Act and reaffirmed in the 1919 Act, Chapter 277, Section 1, currently codified as Section 39–2023—whether the parties to the contracts/under examination intended to simply settle on the margin *and* without effecting bona fide buying and selling transactions on an exchange. The intent of the parties to make or receive delivery is not determinative under 39–2023, once the twofold

threshold test of that section is satisfied.[15]

■ Equally persuasive to the Court that the 1919 Act intended to remove bona fide commodity transactions from the intent test of the 1893 Act, Section 39–2020, is reference to the original Public Act of 1919 as passed by the legislature as compared to the present language of Section 39–2028. The 1919 Act provided in part that:

*"Provided, however,* that nothing herein shall be construed to forbid or to declare unlawful the business of receiving and executing orders to buy or sell for immediate or future delivery any of the property or commodities set out in the preamble of this Act, where the individual, firm or corporation receiving such order shall act solely and exclusively as an agent, broker, or commission merchant, for the individual, firm, or corporation giving such order, and where the agent, broker or commission merchant receiving such order shall either in person or through another agent execute the same upon, and in accordance with the rules and regulations of any legitimate produce, stock or cotton exchange or Board of Trade or other similar body, located either within or without this State, where bona fide trading in these commodities or property is actually carried on, where the rules or regulations thereof forbid the practice or mode of trading hereinbefore declared to be unlawful, and where said rules or regulations require both the buyer to accept and the seller to make delivery upon all transactions entered into upon said exchange, or Board of Trade, and all such transactions are hereby declared to be lawful and enforceable, and *provided further,* that no such contract for the purchase or sale as aforesaid, executed as aforesaid upon any legitimate Exchange or Board of Trade, shall be deemed unlawful as lacking

the essential elements of an actual delivery thereon, for the reason that contract has been subsequently offset or settled between the members of such Exchange or Board of Trade with or through whom any such contract or contracts were made or executed, where the only effect of said offset or settlement has been to substitute other parties, either as buyers or sellers, for those with or through whom the transaction was originally made . . . ."

Tennessee Code Annotated 39 § 2028 taken from the above language presently reads "Nothing in §§ 39–2023—39–2029 shall be construed to forbid or declare unlawful . . . ." in lieu of the original 1919 Act's language "Nothing herein . . . ." Part of the strength of the argument that the 1919 Act did not remove futures transactions from the intent test of 39 Tennessee Code Annotated § 2020 is found in the current section's language "Nothing in §§ 39–2023—39–2029 shall be construed . . . ." Arguably, Section 2020 is outside the parameters set forth in Section 2028 and therefore still operative; however, a reading of the original 1919 Act and Tennessee's 1932 Code § 11308 ("Nothing herein") indicates that the sectional limitation in Section 2028 is a product of codifying the 1955 Tennessee Code and not indicative of the legislature's intent at the time of enactment. It is an accepted rule of statutory construction in Tennessee that interpretation of code sections may be aided by reference to words of the original Act. Holston River Electric Co. v. Hydro Electric Corporation, 166 Tenn. 662, 64 S.W.2d 509 (1932).

Finally, the 1919 Act and Section 39–2028 provide that "[T]he plain intent of this Section (as amended) [language original act] is while declaring all the transactions conducted in and through a bucket shop as described and defined in §§ 39–2023—39–2029 (herein) [lan-

15. State v. Davidson County, 198 Tenn. 24, 277 S.W.2d 396 (1955) permits the Court to look at a prior act to determine the object of a subsequent act.

guage in original Act], to make lawful and enforceable and to withdraw from the provisions of the wagering laws, all transactions executed upon and in accordance with the rules of a legitimate produce, stock, or cotton exchange or Board of Trade, and §§ 39–2023—39–2029 (this Act) [language in original Act] shall be liberally construed at all times so as to effectuate this object."[16]

In Shepard and Gluck v. Thomas, 147 Tenn. 338, 246 S.W. 836 (1922), the first case to interpret the 1919 Act, the Supreme Court of Tennessee upheld a jury verdict in favor of a legitimate broker who sought to recover for losses incurred in the futures market on behalf of Thomas. Although the Court's holding is somewhat clouded by reference to both the intention of the parties and the making of transactions on a legitimate exchange, it is apparent that the Court viewed the 1893 Act and the 1919 Act as separate.

> "It is only when the parties dealing in the futures have no intention of making or accepting delivery of the particular commodity that the transaction is unlawful. Of course, the circumstances and manner of dealing may be looked to in determining the intention of the parties in this regard, but where the fact is established that there was an intention to make and accept delivery of the actual commodity traded in, it is not condemned as a gambling contract. *And* by our act of 1919 (chapter 94) an order to buy or sell commodities for future delivery, when executed by an agent or broker upon a letitimate exchange, shall be deemed the contract of the principal, and the agent or broker shall not be liable for money lost by such party on any such contract. 147 Tenn. at 347, 246 S.W. at 838 (Emphasis added)

The Court proceeded to observe that the jury's verdict brought the futures transactions squarely within the 1919 Act, Section 39–2023, permitting recovery by the broker where the transactions were legitimate within the meaning of Section 39–2023.

■ Citing the *Thomas* case to support the validity of 1919 Act, the Tennessee Court of Appeals in 1934 in Palmer v. Love, 18 Tenn.App. 579, 586, 80 S.W.2d 100 (1934) affirmed the Chancellor's holding that a broker-client's futures transactions were legal and valid despite the client's established unilateral intent not to make or receive delivery. Reference was not made by the Court of Appeals to the 1883 Act. "Dealings in futures and speculations on exchanges are governed by both the Federal Grain Futures Act of Congress (7 U.S.C.A. § 1 et seq.) and the Tennessee Act of 1919, c. 94." 18 Tenn.App. at 584, 80 S.W. at 102. It was pointed out by the *Palmer* Court that the 1919 Act rendered future contracts illegal where "both parties or the broker intended to gamble." [17] 18 Tenn.App. at 590, 80 S.W. at 106. Returning, however, to the language of the 1919 Act and section 39–2023 of the present Code, the conjunctive test is twofold: "wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, . . . shall be . . . closed . . . [1] on the basis of the market quotations . . . *and* [2] without a bona fide transaction on such Board . . . ." The mutual intent to settle on the margin alone, therefore, does not render the contract illegal; this intent does not disable the contract until it is coupled with a mutual intent to settle such margin transactions without making a bona fide exchange transaction. If it should be declared that a mutual intent to settle on the margin alone was tantamount to a mutual intent not to deliver and such an intent rendered the contract void and illegal, section 39–2023 would thrust the legitimate broker into the bewildering and commercially unac-

---

16. It should be noted that not until the 1955 codification was the 1893 Act grouped with the 1919 Bucket Shop Act.

17. For a general discussion of the distinction drawn between gambling and speculation see Taylor, *supra* note 3, at 66 n. 11.

ceptable quagmire of section 39–2020, although a bilateral rather than unilateral intent would control.

The unilateral intent test of the 1883 Act, section 39–2020, was injected, however, by the Court of Appeals into the 1919 Act, section 39–2023 et seq., in Easterly v. Myers, 24 Tenn.App. 688, 691, 148 S.W.2d 640 (1941). Because the *Easterly* case is cited by defendant in support of his position in opposing plaintiff's motion for summary judgment, a recital of its factual background is required. Easterly, a farmer and trader in livestock, and Myers, an acknowledged farmer and speculator in stock and commodities with a record of vacilating success, entered into a partnership whose purpose was to buy and sell commodities through a Knoxville brokerage firm known as Fisher and Company. Despite the expertise of Myers, he was without any money at the time of the partnership's formation and Easterly provided the needed margins to enter the market, approximately $14,000. The partnership lost money and Easterly brought suit to recover one-half of the $14,000. All transactions were evidently bona fide and executed on the Chicago grain market. The Chancellor found and the Court of Appeals concurred that (1) the purpose of the trading was gambling and (2) the parties had no intention to make or accept delivery. The Court of Appeals, setting forth section 39–2020, stated that "[t]his statute makes dealing in futures gaming or gambling when it is the intention of either the buyer or seller not to make or receive delivery." Cited by the Court in support of the intent test were "McGrew v. City Produce, etc., 85 Tenn., 572, 4 S. W., 38, 4 Am.St.Rep., 771 [1886]; Allen v. Dunham, 92 Tenn., 257, 21 S.W. 898 [1892]," notwithstanding that the *Palmer* Court in 1934, under a factually similar setting, stated that "[t]he early Tennessee decisions, made before the Act of 1919, are not in point." 18 Tenn.App. at 591, 80 S.W.2d at 106. The *Easterly* Court further remarked that:

"This rule [unilateral intent test] remained unchanged after the passage of the Act of 1909 as amended by the Act of 1919, now codified under Code, Section 11305 et seq. For said the court in Shepard & Gluck v. Thomas, 147 Tenn., 338, 347, 246 S. W. 836, 838: 'It is only when the parties dealing in the futures have no intention of making or accepting delivery of the particular commodity that the transaction is unlawful. Of course, the circumstances and manner of dealing may be looked to in determining the intention of the parties in this regard, but where the fact is established that there was an intention to make and accept delivery of the actual commodity traded in, it is not condemned as a gambling contract.'

The opinion shows that the court had in mind the Act of 1919, amending the Act of 1909, and that, in spite of the provisions of the latter Act, such dealings constitute gaming where there is no intention of making or accepting delivery of the particular commodity purchased for future delivery." 24 Tenn.App. at 691, 148 S.W.2d at 642.

A further reading of that section of the *Thomas* opinion quoted by the *Easterly* Court above, however, leads the Court to conclude that the *Thomas* Court did not construe the 1893 Act and 1919 Act to operate conjointly to negate the effect of section 39–2023 and 39–2028 but, indeed, interpreted the subsequent 1919 Act to remove bona fide transactions from the scope of section 39–2020.

## THE CLOUD COTTON CASE

While, if left with no case law on the point since the principal decisions of *Palmer* and *Easterly,* the Court would view the state of the futures law in Tennessee to be less than clear, the more recent trend in this area is evidenced in the Tennessee Court of Appeals decision for the Western Division in Cloud Cotton Company v. White, 51 Tenn.App. 212, 366 S.W.2d 144 (1961). There, White, an operator of a cotton gin in

West Tennessee, sold to Cloud Cotton Company of Alabama 161 bales of cotton on a spot rather than future basis, the specific terms being "seller's call, 109 points off July, 1955—New Orleans." This transaction was known in the cotton trade as selling spot cotton on a seller's call. Under this transaction, the buyer takes immediate delivery of the cotton, advances a predetermined amount to the seller and, thereafter, a final adjustment is made between the parties on the basis of the exchange's market price that the seller wishes to call. The seller may call at any market price that he wishes during a stipulated time period. Thus, if the price rises during the interim before the seller makes his call, he will stand to profit at the buyer's expense; if the price drops he will lose at the buyer's profit. Depending upon the fluctuations in the market, each party to the transaction may require the other to put up a specified margin to insure the respective party against loss. The Court of Appeals surmised from the record that Cloud Cotton Company, wishing only to take a reasonable profit on its sale of the 161 bales to other parties, entered a hedge on the New Orleans future market to protect itself from a potential loss suffered on the spot purchase from White at his call. If it lost money on the call transaction, it would make money on the future transaction and if it made money on the former it would be buffered against losses in the latter. Meanwhile, Cloud Cotton would maintain its original profit. When Cloud Cotton sought to recover from White on losses suffered by him due to a drop in the cotton market beyond White's posted margins, White defended on the ground that the transaction was repugnant to Tenn.Code Annotated section 39–2023 and "other gambling laws." The Court's decision in the Cloud Cotton case provides significant guidance in determining the current futures law in two respects. First, as a principal the Court of Appeals did not condemn the Cloud-White seller's call sale because of its speculative basis.

"By means of this transaction the defendant White was able to draw nearly all of the sale price of the cotton, was able to stop the running of nearly all of the interest and was able to stop the running of storage and insurance expenses on the cotton. Thus he *was able to speculate on the expected rise in the price of cotton with only a very small amount invested and with the power exclusively within his control to terminate the contract and take his profit or loss any day he saw fit.*" 366 S.W.2d at 149 (emphasis added).

It is important to remember in this regard that after Cloud Cotton had taken receipt of White's cotton in first instance and in turn sold the same to other buyers at a profit, neither White nor Cloud had any property interest in the cotton commodity itself. While Cloud protected itself from loss by hedging on the futures market, White's interest was solely speculative.

Secondly, in holding the transaction valid the Court remarked that:

"There is nothing even suggestive of a bucket shop operation in the above transaction. In our opinion T.C.A. Section 39–2023 was not intended to cover and does not cover sales of spot cotton such as the one in controversy. *However, even if we assume that it does cover such sales, the record affirmatively shows that Cloud Cotton Company did make a 'bonafide transaction' on the New Orleans Cotton Exchange as provided in T.C.A. Section 39–2023.*

We hold that the contract between White and Cloud Cotton Company is valid under T.C.A. Section 39–2023 and other anti-gambling laws of Tennessee. . . ." 366 S.W.2d at 150.

■ Emphasis must be placed on the portion noted above because the Court of Appeals found in the alternative the contracts executed by Cloud Cotton on the New Orleans Cotton Exchange valid, not because such contracts were entered as hedges, long recognized as an exception

to the gambling laws in Tennessee,[18] but because such future contracts were executed through "bona fide transaction[s]." Thus, it is readily apparent that the test of a future contract's validity is found in section 39–2023 and not the criterion of the unilateral intent test of section 39–2020.

The Court recognizes that in Hux v. Butler, 339 F.2d 696–698 (6th Cir. 1964) the Sixth Circuit remarked that defendant's husband bought and sold futures on a legitimate exchange using corporate funds and that such speculation was in contravention of Tennessee Code Annotated section 39–2020, citing, in particular the Tennessee case of Easterly v. Myers, 24 Tenn.App. 688, 148 S.W.2d 640 (1940). The Court, however recalls that the question presently before the Court, the interplay between the 1893 and 1919 Acts, was neither the central issue nor squarely before the Court on Appeal.

■■■ In summary, a comparison of the 1883, 1909 and 1919 Public Acts of Tennessee, an examination of the caselaw subsequent to the 1919 Act together with the spirit and trend of the law as evidenced in the *Cloud Cotton* case leads the Court to the opinion that section 39–2023 et seq. operates independently of section 39–2020 where it is apparent that the twofold test of section 39–2023 is satisfied. Additionally, if this test is satisfied the Court must also look to section 39–2028. Thus, the transactions here were lawful under 39–2028 if (1) the rules or regulations of the exchange forbid the practice or mode of trading unlawful under section 39–2023 and (2) where the same rules or regulations require both the buyer to accept and the seller to make delivery upon all transactions. The Court has examined the applicable portions of the Chicago Mercantile Exchange and is satisfied that the requirements of sections 39–2023 and 39–2028 are satisfied. See chapters 7, 9 and 11, Rules of the Chicago Mercantile Exchange (1970).

The Court has before it the affidavit of defendant Lee Lambert, in which he submits that "[a]t all times it was my intention, and I verily believe that Merrill Lynch's agent was aware of the fact that it was my intention, to deal simply for the margin or the prospective rise in the price of the pork belleis and that I would sell as soon as satisfactory increase in price was realized or, alternatively, would, in event of a fall in price, sell as soon as possible to minimize my loss." This statement and other parts of the record heretofor cited evidence defendant's past and present intent to make bona fide transactions on the Chicago Exchange and therefore removes such transactions from the gaming and wagering laws of Tennessee, in particular section 39–2020 of the Tennessee Code Annotated (1955). As there appears to exist no issue of fact whether Lambert's transactions fell within the lawful parameters of section 39–2023 et seq., the Court is of the opinion that such contracts are lawful and not void and under section 39–2023 plaintiffs are entitled to the full relief they seek. Accordingly, plaintiff's motions for summary judgment are granted.

---

18. Palmer v. Love, 18 Tenn.App. 579, 590, 80 S.W.2d 100 (1934); Boillin-Harrison Co. v. Lewis & Co., 182 Tenn. 342, 359, 187 S.W.2d 17 (1945); Patterson, Hedging and Wagering on Produce Exchanges, 40 Yale L.J. 843–884 (1931); *see also* Allenberg Cotton Co., Inc. v. Pittman, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974).